Three cases to be submitted today on oral argument regarding the United States v. Rider. Mr. Illick, if I mispronounced it please correct me. Somehow I always get up here and say justice instead of judge so if I do that please correct me. May it please the court. My name is Niles Illick and I represent the appellant Chad Michael Rider. We've presented five issues on appeal. This morning I'd like to focus on issues one, two, and four. Unless the court comes to me with specific questions I don't plan to address sufficiency or the substantive reasonableness of the sentence. You have not waived anything that's in your briefs. Correct. I'm just going to concentrate on one, two, and four unless the court would like me to do otherwise. The first issue we come to the court with this morning is the motion to suppress. This is an argument that the police or the agents violated my client's constitutional and due process rights. The argument is that in the totality of the circumstances the force of the government's coercive actions placed my client in a position where he could not freely exercise his constitutional rights. The first important distinction I would like to make or important point I would like to make to the court this morning is that this isn't about understanding the constitutional rights. It's about the ability to freely exercise those constitutional rights. I think when you read the record and you read the government's brief you'll see indications that my client had some understanding that he had a right to remain silent. The question here is really whether or not the confession that came out was voluntary due to the coercive efforts. The government of course is going to take the position that this is a much more casual conversation than we do. The FBI and the agents didn't come to my client's house to have tea and talk about the neighborhood watch. They came for something much more serious. They came with a search warrant. They came with an indictment. They came with an arrest warrant. They came at 6 o'clock in the morning. They came in tactical gear, some of them in tactical gear. For us, for this to be relevant, for us the voluntariness of the waiver, we do first have to decide he was in custody, correct? Yes. I think you do have to decide he's in custody, but I think that becomes a fairly easy analysis here. The record is going to demonstrate that he was perhaps allowed to leave the police car for the hour and 40 minutes he was in there, but that he was certainly not allowed to leave the area of it. He certainly wasn't allowed to approach his family who was standing in front of him in tears. He wasn't allowed to go talk to his children. He was told that the only way he could really help himself here was to talk to the police. I'm sort of morphing into why this is coercive, but the answer to your question is yes. I think that the record ... He was free to get out of the car and walk around, just not free to go back into the house? He was free to get out of the car, according to the police. He was not free to leave the immediate area. He was not free to go over to his family. They've got the car parked, his family's in front of him. They're in tears because they're coming out of the house when the agents are coming in. It's traumatic for kids, right? I mean, I get that. He's not allowed to go over there to comfort them, to say something to his child. I think when we look at the totality of it, I think we get to that position. What we have to do then is talk about why this is coercive, because as the government points out correctly, they're not using a rubber hose. There's no physical coercion here, but we look to the totality of the circumstances here to see what that coercive force was. When we look at it, and I'm going to repeat myself just a little bit here because I don't want to miss something, they come in at six in the morning. A lot of these agents are in tactical gear. They pass my client . . . they have their weapons drawn. They pass him down the stairs, agent to agent. They come in with an indictment, a search warrant, an arrest warrant. He was never going to walk out of this. He had an arrest warrant for child pornography. He's not going anywhere. They put him in front of his family so he can see his family, but he can't go to them and comfort them. They minimize Miranda. They keep him in the car. He's not allowed to leave the scene. What do you mean they minimize Miranda? Well, they talk about this is just a formality. We have to do this because we're the feds. This is something we do in every case. We can live without this, but we're just going to do it on the safe side. They do that several times. They ultimately give him Miranda, but they go out of their way to minimize it. Then what really tips the balance for me is they go after his faith. They go after his faith and they talk about this duty to confess, this duty to repent. It isn't like you're talking about building a rapport between an agent and someone they're interrogating. This is going to something really fundamental. It's not like saying, hey, I like the Green Bay Packers, you like the Green Bay Packers and building a rapport. This is about this man's faith and this duty, this Christian duty to go and to confess your sins and the police and the agents use this to say, confess to me. Now, as far as I know, the duty to confess is to God, not to the police, but the police use this to say, confess to us. But appeals to conscience are permitted. You're saying not in the totality? I think when we look at this in the totality, the whole circumstances, it becomes overwhelming. One of those is this appeal to your religious faith to confess, to give up the secret. We know that because of the priest penitent privilege. We all are aware of the priest penitent privilege. You can go talk to your priest about anything you want and it can't come out in court. That is because of this human need, this human desire that the Supreme Court has recognized to unburden yourself to someone in a privileged situation. When we add all of those up, we come to a circumstance where the coercive efforts added all together render the confession involuntary. The case we've used is the Adair case. Now, Adair is a case out of the Southern District of Texas. Of course, it has no binding precedent on this court. We use Adair because it is such a well-written case and it's so persuasive on the use of the due process clause. The easiest thing to do with Adair, I think, is to say that there are differences. Look, there are differences. These are not exactly the same cases. Of course, we can make factual distinctions. But when we look at the totality of Adair, we look at the totality here, there are enough similarities that I think Adair applies. These principal similarities, there are a lot of them, but again, it's a case where Miranda is given but de-emphasized in both cases. The defendant is told that the only way to help themselves is to talk to the police. In both cases, they come in early in the morning, they take the guy out in his pajamas or whatever he's wearing. It was boxers in Adair. But I think it's the differences that make this case compelling. The differences, in my mind, make this a really much worse case than in Adair. Adair was alone in his house. He didn't have his family there. I don't know if he had a family, but he was alone. Here you have the family standing in front of the police car where the client can see them, and the client is told, or the appellant is told, the only way you can get to your family is by talking with us. The only way for you to help yourself, to go back to your family, for us to feel that your children are safe with you near them, is to talk to us. Adair, I think it's important, they came with just a search warrant. They didn't come with an arrest warrant. Here, this guy, no matter what he said, he was going to jail. They had a federal arrest warrant, an indictment for child pornography. There was no chance that they were letting my client stay. Then, I think we have to go back to this reliance on the religious duty. To me, it's what really bothers me about this case. I think you'll see it on page 762, ROA 762, where the client, where the attorney asks Adair, or Adcock, I'm sorry, did you use this faith to manipulate him? He says yes, and he admits that the faith was used to pull the statement out of Ryder. The question came from the defense attorney, but Adcock agreed to that. He agreed that he used our client's faith to pull this confession out of him. Faith was not an unknown element here. This was happening in a church. Everyone knew about the deep connection to the church and the faith in this case, and that became a tool to use to secure a confession. Ultimately, I think when we look at all these facts, we have a case where the coercive effort of the government overcame the client's free will. We asked this court to reverse it on that ground. Turning very quickly to the second argument, argument two in our brief, this is the one about the abuse of discretion and refusing to allow Dr. Compton to testify. I think it's important to emphasize that the decision not to allow Dr. Compton to testify occurred before a jury was in panel, before the court heard any evidence. It occurred preemptively, before trial. The court ruled that Dr. Compton couldn't testify under 401, 403, and 702. I'm not going to repeat those to you. I know you all know what those are, and I'm going to treat them the same. Dr. Compton was going to come in and testify that Appellant was overly compliant with others and that he had no pedophilic interests. The government sought to exclude this evidence, and the district court ultimately agreed with that argument. To do that, they relied on cases like Wallenfang and Ernst. These are out-of-district cases. I think one's a Tenth Circuit case and one's a Sixth Circuit case, maybe Eighth Circuit. I think what's important about these is that when we look at these cases, these are cases that talk about the 2251 elements as they're set out in the statute. They don't go into the dose factors. I may be mispronouncing that word. I don't know if I get the name right there. They don't go into the dose factors, but here in the jury charge, we have the dose factors. Judge Higginbotham has written about some of . . . . . . Are you talking about the sixth dose factor? I am. All right, but that factor doesn't ask whether the defendant subjectively intended the depiction to be lascivious. Well, it doesn't, but it does ask whether it intended to elicit a sexual response in the viewer. It asks whether the image . . . So that's subjective as to the viewer, not the defendant. Well, but the viewer could certainly be the defendant in this case, Judge Smith. The jury could have convicted my client as being the viewer of this material and he had every right to come in and his defense was, look, I never meant to take pictures of naked kids. I thought it was going to be a funny montage. I thought I was acting under Pettigrew's influence. I'm not saying it's a great defense. What I'm saying is that's what his defense was. The fact that you've got an objective person coming in and saying, look, he has no pedophilic interest, so when you go to decide whether or not this image was designed to elicit a sexual response, at least when it comes to Mr. Ryder, here's a reason for you to find the answer no. Now if the court hadn't included the dose factors in the jury charge, especially factor number six, I don't think we'd be having this argument. What makes this case different is that the jury charge does include those factors and when you do include those factors, intent becomes an issue when it otherwise wouldn't be. I think that goes very much to Judge Higginbotham's point in Steen where he wrote about the problem of the continued use of the dose factors and especially when it goes to factor number six. Einstein was right, time is relevant and it is relative and it is moving very quickly for me. With that, I'd like to move to issue number four, if I may. This is the issue of constructive amendment. I can talk to the court all day about what a constructive amendment is, but I think the court knows. Basically it is a . . . when the charge allows a conviction . . . You're under plain error of review on that? Absolutely, Your Honor. We tried to argue that it's preserved with the late motion for new trial. I think I have to concede to the court that it wasn't timely and we have to do this under plain error of review. That's just, I think, candor to the court. I think we have to be there. I think the issue comes down to something relatively simple. The government will tell you correctly that the entire law for 2251 is included in each one of these indictments and they're exactly right, it is, but when you go down further in the indictment, it says specifically and then it narrows the number of ways in which the indictment, in which the conviction can be secured. By saying specifically, plain language, specifically, it narrows it down from all of these different ways to commit it down to one and that way is with a recording device and the internet, yet the charge says that the material that had been mailed, shipped, transported in commerce by any means, including a computer, so it gets much wider. I think we meet the plain error. Number one, there's error. Number two, it's plain. It's plain because you simply compare what's in the indictment to what's in the charge and number three, it goes to the fundamental fairness because we do not convict people for things they do not have notice of. I see that I have three seconds left if there are any questions, otherwise I appreciate the Court's time this morning. Yes, you've saved time for about . . . Yes, Your Honor. Thank you. Thank you for your time. Ms. Miller? Good morning. May it please the Court. I take interest that we again are before this Court on this issue with this sufficiency or excuse me, the statement that the defendant has made in this citation to Adair, this case out of the Southern District, which is not citing any law from this Court and we appear to be balancing this line. Judge Higginson, as you noted, first we must start from that question, is this a custodial interrogation? The District Court found that it was not and it's my understanding and listening to counsel this morning that he agrees with that, that it was not a custodial interrogation and that may be the first place that we do break from Adair. Adair, the District Court was particularly bothered by a number of the leading the defendant out handcuffed in his underwear, refusing to allow him to use the bathroom unaccompanied. In this situation, the defendant's family was already outside. It was the defendant who refused to come outside of the house. The testimony at trial was he walked out of the house unattended. He emerged from his bedroom clothed, walked down the stairs, walked into the front yard where the agents approached him and said, would you be willing to speak at our car right there at the foot of your driveway? And he said, sure. He entered the car of his own volition and from there they spoke. They did provide him with the Miranda waiver. There is this suggestion that somehow the Miranda process needed to be much more solemn and I would submit to the court that that takes beyond any of the case law from this court or indeed the Supreme Court, that somehow there needed to be this air of authenticity. The question is, did he understand his rights and was he in a place where he could evaluate those rights and continue? The district court found that he did and that was made correctly. In this case, we're asked further about was there an era of moral coercion and your honors, the discussion of religion was brought up by this defendant. He is the one who said, I am a spiritual man. I have been a member of this church and he is the one who immediately tried to turn it back to his co-defendant, trying to allege that it in fact was Mr. Pettigrew as his pastor to whom that he had to submit. And your honors, I would submit that that is no different from many other law enforcement techniques. At this point, Mr. Ryder has put out that his faith matters, that he wants to talk about his faith. So the agents went with it. This whole idea of priest penitent, this was an educated man who knew why the agents were there. He knew they were there with an arrest warrant. He certainly didn't view the agents as his confessors and that they were going to provide him some sort of forgiveness or relief from this situation. He knew that he wasn't in a confessional. He wasn't in a church. He wasn't speaking to someone that he trusted. In fact, the testimony both at the suppression hearing and again at trial was this was far less of an interview and far more of a chess match with Mr. Ryder using every opportunity to determine the depth of the agent's knowledge as to his conduct, just as much as it was an opportunity for him to answer their questions. He refused to answer their questions. For example, they implored him. Please tell us where the other hidden cameras are. He refused to answer. He further vehemently disagreed with some of their questions or their suggestions, suggesting this wasn't a man who was morally bowed, feeling under the pressure of some sort of coercive techniques. He was giving it back just as well as he was getting. I think there's the fact that it's religion obviously makes it more difficult for the defendants to speak to the defendant about their own drug problems. It's not uncommon in child exploitation cases for the agents to speak with the defendant about their sexual interests, their pornographic interests. It is indeed a tactic to meet the defendant where they're at. The case that we cited in our briefing from this court, I don't believe was a published case. That was the Gonzales-Gomez case. But in that case, this court said there's nothing wrong, in fact, if the agents wanted to make material misrepresentations to Mr. Ryder. In this case, the only representation was that Mr. Pettigrew was speaking. He was. They were looking at Mr. Ryder. They were. The only thing at that point that Mr. Ryder didn't know was that they had an arrest warrant. But that then takes us back to the whole analysis under custodial interrogation. And we use a reasonable person standard. Would a reasonable person have felt that they were free to leave? Well, Mr. Ryder popped open the car door to yell at the agents who were searching. He didn't like the way that they were trying to open up the hitch on his truck and wanted to tell them the proper way to do so. So, Your Honor, there is nothing in this statement, in this interview, that takes it outside of the realm of any other other than the fact that religion was invoked. But in this case, it was revoked, invoked by Mr. Ryder himself. In my difficulty, and I'm waiting for you, that's that's waiting. The difficulty for me, these cases is always state of mind. But the pattern was used here, correct? It was. It is a specific intent crime. It is. According to Steen, it's subjective, not objective. It is subjective in determining. Parts of it, Your Honor, I mean, if we're going to go to the crime itself, obviously, this is a sufficiency question. This is oh, in this. So it's not a sufficiency question for me. It's the expert, because on top of specific, subjective, in part, plus we tell the jury, use the dose, six factors, but they're non-exhaustive. And the third, the final one has just confused us. It is startling to me the government would ever want to keep any qualified expert opinion about a defendant's state of mind out. Because we're talking about terms like lascivious and arousal. And was he submissive to the pastor, which is his defense? So I guess to turn that into a question, what would you say is the ground to affirm the exclusion of a defense expert opinion? 401, 403, 701? I think we need to look at all of them. And I think that. It's hard for me to see it's not relevant. 401. I mean, Sandra, it's such a complicated notion. I do.  It's from the Third Circuit. It is United States versus Heinrich. That is 57 fed forth, 154. That's a 2023 case. A very similar situation in which the defendant sought expert testimony about whether he had photographed these children to create art or some other way. And he wanted to introduce expert testimony along those lines. The Third Circuit's holding on that with respect to that probative value was, rather, it addresses Heinrich's purpose for taking the photos. But that purpose is irrelevant to the statute. I'm also concerned here that we're talking about this, oh, fun, candid photos. That only goes to count one. Counts two and three are solely attributable to Ryder. And there was no suggestion. Two and three are the home and the neighbor photos? That's correct, Your Honor. And there was no suggestion either in his testimony or, indeed, in his interview with law enforcement that, again, this was part of some sort of candid camera situation. So to say that. I thought he was, his defense in part was, well, the pastor had his wife's photos and, therefore, there was sort of an element of extortion. There could be. And, therefore, the expert was going to say he's particularly submissive. But, Your Honor, I would go back to 2251. Did the defendant use the children? Under this court's precedent, and Steen and Grimes, absolutely. That actus reus is met. To arouse himself. So the question is, for the purpose of creating, for sexually explicit conduct, for the purpose of creating that visual depiction, the purpose of creating the visual depiction is a factual matter, then, for the jury to decide. So to have the expert come in and weigh in on that, that's where the government's concern that we come into that Rule 702, is now the expert supplanting their interpretation for the jury's view. And I hate to cross back over into the sufficiency line, but this court's line of cases has said that it is incumbent on the jury to look at that image, at that video. In your brief, I mean, I'll look at this Third Circuit and opposing counsel needs to be able to, but in your brief, had you cited any 2251 case where any circuit affirmed the exclusion of an expert pertaining to the state of mind? Your Honor, our primary cases were the NADU case, which was from this court. I believe that went to possession of child pornography. So the knowledge element is slightly different. The Esch case from the Tenth Circuit, I apologize, Your Honor, I don't recall if that, the Esch case was the primary case relied upon by both the government as well as the district court. The sixth factor is eliciting an aroused view. Yes. In the viewer, as Judge Smith clarified. Correct. His answer is, well, Mr. Ryder, the jury could have been asking, was he the one who was being extorted by Mr. Pettigrew? Was he the one who was being extorted by Mr. Pettigrew? And if he doesn't have any arousal, he's just giving it to the pastor that has all those. But as many courts have found, the viewer could be many people. As the court noted, one of Mr. Ryder's claims was that he was being extorted, for lack of a better word, from Mr. Pettigrew. Mr. Pettigrew being a known pedophile. Were those visual depictions being created from Mr. Pettigrew? Were they being created for a third party? That issue was not for, before the court. Who that viewer was, was not a decision made by the jury. Was it something they could find out? It's the government's position. Yes, it was. That this jury then would have been confused. They very well may have been. Particularly an expert coming in and, and providing information about the defendant's mental state almost suggests that that was an element of the offense. Almost creating a fourth element. That it had to be Mr. Ryder who was the viewer. And that would invite concern or confusion from the jury, had they heard that testimony. I'm sorry, I didn't want to interrupt the court. No, no, no, no, thank you. I usually have a lot of questions, but I stopped. I think it's also. Okay, I do have one. Okay. Just remind me, in this, on this argument as to the expert, is he suggesting that had the expert been able to testify about his state of mind, that would have obviated him, the defendant from taking the stand? I don't believe that that was articulated. I think that's certainly a logical conclusion. Um, how, however, I think that raises another 403 concern. The defendant has repeatedly said that the expert would have made his argument more plausible. And as a simple trial attorney, Your Honor, as soon as I hear more of this, I would be bolstering to me, which would essentially be calling in a ringer to say, um, my, my view sounds, sounds more reasonable. So believe me, because I have a heavy hitter on my side who says that my side makes more sense, which is generally disfavored, uh, in the rules of evidence. I would further note in, in a case like this, that Mr. Ryder's story, as it were, was already coming in. It came in through that, that interview that, that he made with law enforcement. So indeed they had already heard from Mr. Ryder well before he made the decision about whether he wanted to testify in this case and it's further the, the government's contention. And I, I know that the defense does, excuse me, the appellant disagrees with this, but it's much more compelling coming from Mr. Ryder himself than an individual who's sitting on the stand who has never seen any of these images before, who does not know any of the parties, who hasn't, uh, spent much time with Mr. Ryder for him himself to explain why he, he did these things. I will address finally, Your Honors, the, uh, the constructive amendment issue. Um, I, I know in this case, our indictment directly mimicked the statute. It followed the statute directly. Now the question before the court and indeed by the case law raised by the appellant is whether that jury instruction, you know, when we look at Supreme Court cases like Sterone, did the jury instruction find a way for the jury to convict beyond that which is provided in the indictment? And it's the government's argument that in fact, the jury instruction did the exact opposite. The government, uh, uh, pleaded the case broadly providing all three grounds for jurisdictional basis. And indeed it was the decision, uh, by the government with Mr. Ryder to agree with the court to only provide an instruction as to one. So the jury instruction was much narrower than either the indictment or the statute in this case. It was made very clear to the jury that we were proceeding solely on the grounds that the indictment had been produced using materials. Now, where the appellant and the government really crossways is that final statement with the government describes it as the brief description of the offense, truly as intended to provide the defendant with knowledge of who he was being alleged to have committed the offense again, against particular, when we're talking about counts two and three, they are two different those details as to who the victim targeted by that particular count was, as well as providing example means. Um, the defense argues that the concealed recording devices and the internet is what broadened in this case, but that in fact is not the case. That is how the government in fact proved its case. The evidence seduced at trial was that Mr. Ryder and Mr. Pettigrew ordered all of these concealed cameras that were used to film the victims in counts one, two, and three via Amazon. Those Amazon purchases required the use of the internet and the testimony adduced was that those cameras ordered from Amazon, uh, were transported in interstate commerce through various Amazon shipping warehouses across the United States. And indeed looking back at the record, the government with respect to both counts two and three and closing arguments directed the jury to look at those Amazon camera devices while also referencing the Mac store device, uh, that the images were ultimately found on. So the charge language given to the jury, um, disagreed. I mean, was not consistent identically with the indictment as well as the pattern instructions, or it was identical to the pattern instructions. The charge given to the jury was identical to the pattern as well as to the indictment. However, while the indictment as well as the statute provides three different jurisdictional bases, we narrowed it down to one. They agreed to that. They did. That's a relinquishment of the issue. It's not a forfeiture. I, I, essentially the question is, has the defense invited error in this case? Because the instruction that was given to the jury is exactly what the defense agreed to. So that's a, that's not subject to plain error review, is it? We, we have agreed because we, anyway, that is an excellent question, Your Honor. I, I think there, there's certainly a, that is something that could be submitted to the court regardless of what the standard reviewed. In this case, it is the government's assertion that rather than expand as the indictment does, it is the government's assertion that the indictment does not provide specific steps to contract. And indeed there was no difference between the indictment and the jury instruction because first of all, the jury was provided with a copy of the indictment, but second, the government proved exactly what was written in that indictment. And finally, Your Honors, I, I have just, just one moment or less than two minutes left, so I will note in this case, um, with respect to the sufficiency, clearly Mr. Ryder has conceded that he is the individual who filmed the children in all three counts. He is not challenging what we've referred to as the church videos. I note that the conduct in counts two and three essentially parallels the, the conduct that this court found in the McCall case. As the case law has developed in this area, the government is aware of no court in this country other than the D.C. Court of Appeals that has ruled differently on, on filming exactly as presented in this case, um, and would ask the court, uh, again to affirm the conviction on those grounds, it consistently with the case law, not only in this circuit, but as well as across the nation. And finally, Your Honors, with respect to, uh, Mr. Ryder's ultimate sentence, I note that there, first of all, the district court provided ample, uh, justification for the sentence. He seems to use Mr. Pettigrew's, uh, sentence as his benchmark, which this court has repeatedly instructed co-defendants not to do. Um, Mr. Ryder even used the phrase benchmark, despite the fact that this court in the Stallknocker case said that co-defendant sentences should not be a co-defendant sentences. In this case, the defendants, both Mr. Ryder and Mr. Pettigrew received the exact same sentence on count one. They both received 360 months. Mr. Ryder's sentence is longer because of the count three. And that is my time. Thank you, Your Honors. Thank you, Ms. Miller. Mr. Sohn for rebuttal. May it please the court. A lot to cover in five minutes, but I'll do my best. I want to start with the expert and just so the court is clear, this wasn't a decision the district court made after it heard opening statements, after it heard any testimony, after it heard Mr. Ryder's defense, it was made prior to jury selection, the court made some findings based on no evidence before it that Dr. Compton's testimony was not relevant and was prejudicial. The government comes back to the court on the prejudice aspect and says, well, it's prejudicial because Mr. Ryder's testimony would be more powerful than the expert. And two minutes later says, well, the expert would be more powerful than Mr. Ryder. The case that the government cited today, of course, was never provided to us. So I don't even have a chance to review it or address it with the court. The point that the government seems to make is that because Mr. Ryder testified, that means Dr. Compton's testimony is irrelevant and prejudicial. And the prejudicial part is the key because the government had all means at disposal to deflate, deflect, challenge any prejudice. They could have asked for time to hire their own expert. They could have done a background check on Dr. Compton. They had substantial time for cross-examination had she testified, but they chose to simply ask the court to strike her, which the judge did. And the point is it's relevant in two ways. Dr. Compton was significant and relevant to our client's theory of defense, that he was pressured into doing this by Mr. Pettigrew. He told this to the police in his statement. He testified that before the jury. Here's an expert that would support. Instruction that went to duress or coercion. No, it did not reach that level. Your Honor. No, you sort of have to ask for even a Steen instruction. You need to ask for something modified that fits this notion of priest penitent coercion, the jury would be confused. They're told this is a non-exhaustive list that goes to see enter. And then the defense theory is one of, well, it isn't coercion. It isn't duress, but his faith is sort of forcing him to indulge in this swirl. That's the problem though. If this had been addressed by the court at the close of the evidence, we could have made those arguments and requested that instructions for determinations are made pretrial, but again, that's when the discovery, the reports turned over. So I'm focused on confusion. I just don't, you just said the primary purpose was his subordinate relation to the priest. And I'm looking at the jury charge and thinking, how would this jury factor that into anything they were told to consider? Well, it's the relevance is on two points. That is part of it. The second part is part of it. We'll finish that thought. If that's part of it, it goes to what instruction they were given. What would they have logically fit that theory into? Well, it would have been that Mr. Mr. Ryder did not have the specific intent to commit this crime because, because in fact, he is a compliant individual. He's has personality traits that allow him to be subservient to the will of others. He's talking about a pastor here. This must be in every single drug conspiracy case. We could have an expert saying, well, the vast majority of these conspirators, they were subservient to the top guy. No judge expert testimony about subservience. No, this is a little different judge because Mr. Ryder has been in this church for generations. He's dealing with the pastor of his church. He's testified a pastor has a higher place in his life than most people because he's brought up in that case where this theory, an expert spoke to subservience, I don't think either defense or the government has a case on this point. But again, it also is intent as far as the second, the sixth DOS factor, which the courts indicated talking about my client, not being a pedophile, if he does not have any sexual interest in depicting or depicting sexual interest, because he has no interest in children, that's a relevant portion for Dr. Compton to testify. So our position is there to be confusing to a jury without more explanation. Also, my client's not a pedophile. Doesn't mean he doesn't get aroused by images. Well, that would be brought up with the expert at trial. I mean, we could ask for instructions based on her testimony, but without her testimony, we're in a position we can't ask for instructions. I think Sienta is confusing. And anytime the government, you know, when Sienta is the crux of a crime and the government decides to knock out an expert on it, it's, it's a little perilous. Oh yeah. We're not dealing with strict liability case. We're dealing with a specific intent case. And we had evidence to tend to support the fact that our client did not have that intent. The government's saying, we don't want you to present any evidence to support your defense. And if I have just a few seconds remaining, when the government talked about the, the statement, the custody, the court was correct. Judge Higginson is correct. We did not concede that our client was not in custody. He's taken out of the house by a full-blown SWAT team. There's over 20 armed officers in tactical gear, long guns, removed from the house, physically passed down the stairs, one office to another, met the agents outside and brought into a police vehicle with two armed agents for an hour and 41 minutes. He's looking out the window, seeing his cry and family on the porch. Yes. Did he, was he, was he allowed to leave? All he did was shout out the window to the police. They were trying to search his truck. Don't do that. You're going to break my truck. But to suggest he was not in custody is an absurd position. The government minimizes. And at one point they're saying my client knew about the arrest warrant. Then they said he didn't. They came there with an arrest warrant and a search warrant and an indictment. He wasn't going anywhere. Any federal agent that releases an individual under those circumstances will probably lose his job within minutes, especially if the client flees the country. So your, your time has expired. No, we've got to buy fast. Thank you, your honors. I appreciate your time. Your case is under submission. Next case securities and exchange.